UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| PAULA MCALLISTER, | ) |
| --- | --- |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 3:17-CV-867 JD |
| INNOVATION VENTURES LLC, | ) ) ) |
| Defendant. | ) |

## OPINION AND ORDER

The Americans with Disabilities Act protects disabled employees who can do their jobs with reasonable accommodations. An extended leave is not a reasonable accommodation, though, as it does not enable employees to do their jobs. Just the opposite, it would allow them to *not* do their jobs. Employees who need extended leaves because they can't work are thus not protected by the ADA.

Paula McAllister fell into that unfortunate category. She worked for Innovation Ventures when she suffered serious injuries in a car accident in June 2016. As she began her long recovery, she first received leave under the Family and Medical Leave Act. When that ran out but she was still unable to work, Innovation let her stay on medical leave. Once six months had passed since her injury, though, Innovation terminated her employment. By then, Ms. McAllister was still undergoing evaluations and her doctors had not cleared her to work. Ms. McAllister requested further leave until February 2017, when she hoped to be able to return, but Innovation declined.

Ms. McAllister thus sued under the ADA. She claims that Innovation should have granted more leave as a reasonable accommodation. That leave would not have been a reasonable accommodation, though, as it would not have allowed her to do her job. Ms.

McAllister argues in the alternative that she could have returned to work at the time she was fired. But there is no genuine dispute that her doctors had not allowed her to return to work at that time. Ms. McAllister thus was not protected by the ADA at the time of her firing, so the Court grants summary judgment.

## I. FACTUAL BACKGROUND

Innovation operates a production facility that produces energy drinks. Ms. McAllister began working there in October 2014. She later became a machine operator on the production line. Multiple machine operators worked on each line, performing a variety of functions, several of which Ms. McAllister had been trained on. The positions can be physically demanding. They also require concentration and attention to detail, as the facility produces consumable products.

On June 10, 2016, Ms. McAllister suffered serious injuries in a car accident. She was hospitalized with injuries to her head, neck, and spinal cord, and underwent spinal surgery. After the accident, Ms. McAllister began taking leave under the Family and Medical Leave Act. In support of her request for leave, her doctor, Dr. Kachmann, certified that she was unable to perform "any & all" functions and could not work. Innovation granted that request. Ms. McAllister also applied for and began receiving short-term disability benefits. Her doctor completed a similar certification in support of that application.

Ms. McAllister continued her recovery from those injuries over the ensuing months. In August, she had an office visit with a physician's assistant. The physician's assistant wrote that Ms. McAllister was progressing but was still experiencing a variety of effects, including concussion symptoms. She wrote "We will keep her off work until [a follow-up appointment in six weeks] due to lifting restrictions and activities and continue her with physical therapy. I don't feel at this time she is quite ready to go back to work." [DE 72-16]. Ms. McAllister's FMLA leave expired the next week, but Innovation allowed her to remain on leave.

Ms. McAllister next visited Dr. Kachmann in October. At that appointment, Ms. McAllister reporting experiencing issues with balance, dizziness, memory, and speech. Dr. Kachmann decided that she would need to undergo a neuropsychological examination with a specialist before she could return to work. In a work status report, he wrote: "Continue [physical therapy], Neuropsych for concussion [symptoms]. Estimated off work for 6 more weeks[.]" [DE 82-31].

Later that month, Ms. McAllister met with Innovation's human resources manager. She reported to him that her doctor needed additional neuropsychological testing before he would approve her return to work. The manager informed her that under a new policy, she would not be allowed to remain on leave for more than a total of six months. Thus, if she was not able to return to work within six months of her injury, Innovation would terminate her employment. He encouraged her to apply for social security disability benefits and long-term disability benefits if that was the case.

Ms. McAllister next met with Dr. Kachmann in November 2016. Following that visit, Dr. Kachmann wrote a work status report. He certified, "[Ms. McAllister] will not be released to return to work due to further testing by [the neuropsychologist]. Estimated off work until 02/2017." [DE 72-21]. Later that month, Ms. McAllister wrote to Innovation. She noted that her neuropsychological evaluation was scheduled for December, and she asked that her position "be held for [her] return which is anticipated to be February 2017." [DE 72-22]. By December 10, 2016, though, Ms. McAllister had been on leave for six months and still had not been cleared to return to work. Thus, on December 14, 2016, Innovation wrote to Ms. McAllister informing her that it was terminating her employment. Ms. McAllister asked Innovation's human resources manager to reconsider and to continue her on leave until February 2017, but he declined.

On December 16, 2016, Ms. McAllister's neuropsychologist completed a certification in support of her disability claim. He wrote that she could not return to work at that time, with or without restrictions, and that he anticipated she could return to work in June 2017. Ms. McAllister later applied for long-term disability benefits and social security disability benefits, certifying that she became unable to work on the date of her injury. She was approved for both forms of benefits. She received long-term disability benefits until October 2018, and is still receiving social security disability benefits. Ms. McAllister's doctor's office completed similar certifications in August and December 2017, stating that she was unable to work in any capacity.

Ms. McAllister filed this action in November 2017. Her complaint alleged that Innovation violated her rights under multiple statutes by terminating her employment. Discovery has closed and Innovation moved for summary judgment.

## II. STANDARD OF REVIEW

A court must grant summary judgment if the movant shows that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one identified by the substantive law as affecting the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" exists with respect to any material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. Where a factual record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial, and summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether a genuine issue of material fact exists, courts must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in that party's favor. *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008); *King v. Preferred Tech. Grp.*, 166 F.3d 887, 890 (7th Cir. 1999). The non-moving party cannot

simply rest on its pleadings but must present evidence sufficient to show the existence of each element of its case on which it will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000).

### III. DISCUSSION

Ms. McAllister's complaint asserted claims under a variety of statutes. Innovation moved for summary judgment on all of the claims. In response, Ms. McAllister defends only her failure-to-accommodate claim under the ADA. The Court thus grants summary judgment as to the remaining claims. As to the ADA claim, Ms. McAllister argues that Innovation should have given her more leave or allowed her to return to work with accommodations, and that it violated her rights by instead terminating her employment. The critical issue to that claim is whether Ms. McAllister qualified for protection under the ADA at that time.

The ADA forbids discrimination against a "qualified individual on the basis of disability." 42 U.S.C. § 12112(a). The Act defines a "qualified individual" as a person who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* § 12111(8). "If the proposed accommodation does not make it possible for the employee to perform his job, then the employee is not a 'qualified individual' as that term is defined in the ADA." *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 480 (7th Cir. 2017). A plaintiff bears the burden of showing that she was a qualified individual as of the time of the employment decision. *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 524 (7th Cir. 1996).

Ms. McAllister first argues that she could have returned to her job had she received additional leave. That argument fails as a matter of law, as the Seventh Circuit has held that an extended leave of absence is not a reasonable accommodation. *Severson*, 872 F.3d at 479; *Byrne v. Avon Prods., Inc.*, 328 F.3d 379, 381 (7th Cir. 2003). To be a qualified individual, a person

5

must be able to "perform the essential functions of the" job with a reasonable accommodation. 42 U.S.C. § 12111(8). Thus defined, a reasonable accommodation must be a measure "that will enable the employee to work." *Severson*, 872 F.3d at 479. But an extended leave "does not give a disabled individual the means to work; it excuses his not working." *Severson*, 873 F.3d at 481; *see also Byrne*, 328 F.3d 381. "An employee who needs long-term medical leave *cannot* work and thus is not a 'qualified individual' under the ADA." *Severson*, 328 F.3d at 479; *see also Byrne*, 328 F.3d at 381 ("Inability to work for a multi-month period removes a person from the class protected by the ADA.").

That's not to say that an inability to work for even a short amount of time excludes a person from the ADA's protections. The ADA states that a reasonable accommodation may include "part-time or modified work schedules." 42 U.S.C. § 12111(9)(B). And the Seventh Circuit has acknowledged that "[i]ntermittent time off or a short leave of absence—say, a couple of days or even a couple of weeks—may, in appropriate circumstances, be analogous to a part-time or modified work schedule." *Severson*, 872 F.3d at 481. In *Haschmann*, the plaintiff experienced a lupus flare-up that required time off of work. *Haschmann v. Time Warner Entm't Co.*, 151 F.3d 591, 601 (7th Cir. 1998). The plaintiff's doctor wrote that the flare-up would be "short-lived," and the plaintiff requested two to four weeks of leave. *Id.* The Seventh Circuit held that a jury could find a short-term leave for that period to be a reasonable accommodation. *Id.* Since then, however, the Seventh Circuit has consistently held that any longer periods of leave were unreasonable and demonstrated that the individual was unable to work. *Severson*, 328 F.3d at 481 (two- or three-month leave); *Byrne*, 328 F.3d at 380–81 (two-month leave); *Hamm v. Exxon Mobil Corp.*, 223 F. App'x 506, 508–09 (7th Cir. 2007) (one month of leave shortly after returning from an extended leave).

6

Ms. McAllister's request falls on the wrong side of that line. By the time Innovation terminated her employment on December 14, 2016, Ms. McAllister had already been on leave for six months. Her FMLA leave had long since expired. She requested more leave, with the hope of being able to return in "February 2017," meaning she still needed another seven to ten weeks of leave.[1] Ms. McAllister argues that her request compared to *Haschmann*, where the plaintiff requested two to four weeks of leave shortly after taking two weeks of leave and working two weeks with a reduced schedule. But the leave she requested was over twice as long, and came after she had already been off work for six months. That is much closer to the multi-month periods at issue in *Severson* and *Byrne*. It is also longer than the one month that the plaintiff in *Hamm* requested after an extended leave, which the Seventh Circuit held was unreasonable. 223 F. App'x at 508–09. If Ms. McAllister had already been off for six months and needed another seven to ten weeks of leave before returning, then she was not an individual who could perform the essential functions of her job at that time. The additional leave she requested would have only excused her continuing inability to work, not allowed her to do her job. *See Byrne*, 328 F.3d at 381 ("Not working is not a means to perform the job's essential functions. An inability to do the job's essential tasks means that one is not 'qualified'; it does not mean that the employer must excuse the inability."). She thus cannot be a "qualified individual" due to the prospect of the extended leave she requested.

---

[1] Ms. McAllister suggests that she might have been able to return earlier than February 2017 if she had been granted leave. But both she and her doctor told Innovation that her anticipated return was February 2017, and that is the leave she requested. *See Amadio v. Ford Motor Co.*, 238 F.3d 919, 928 (7th Cir. 2001) ("The facts relevant to a determination of whether a medical leave is a reasonable accommodation are the facts available to the decision-maker at the time of the employment decision.").

Ms. McAllister argues in the alternative that she could have returned to work in December 2016. The evidence does not support that argument, though. Ms. McAllister argues that she could have performed her job as a machine operator if she was assigned only to particular tasks within that job. She also argues that she could have been reassigned to other jobs in the company. As evidence that she could perform those jobs, she relies primarily on testimony by her and her sister (who also worked at Innovation) that she could have performed the jobs. She also relies on evaluations performed in September and October 2017—over ten months later—among other evidence.

None of that changes the fact, though, that when Innovation made its decision, Ms. McAllister's own treating physician had told Innovation she was not yet able to work. Shortly after Ms. McAllister's injury, Dr. Kachmann wrote that Ms. McAllister was unable to perform "any & all" functions and was unable to work. [DE 72-13]. In August 2016, a physician's assistant wrote that Ms. McAllister was still not ready to go back to work. [DE 72-16]. In October 2016, Dr. Kachmann completed a work status report in which he certified that Ms. McAllister was undergoing physical therapy and a neuropsychological evaluation for concussions symptoms, and that she would be "off work" for an estimated six more weeks. [DE 82-31]. After the next follow-up appointment in November 2016, he wrote that she "will not be released to return to work due to further testing[.]" [DE 72-21]. He also wrote, "Estimated off work until 02/2017." [DE 72-21].

Ms. McAllister did not give Innovation any reason to doubt the opinions of her own treating physician. In fact, she acknowledges she told Innovation that she needed to undergo a neuropsychological examination before her doctor would let her return to work. [DE 82 p. 14; DE 72-22]. Innovation was entitled to rely on that assessment by Ms. McAllister's own doctor.

8

*Stern*, 788 F.3d at 294 (holding that an "employer is 'entitled to rely on a physician's recommendation' that the employee is not able to safely perform an essential function of his job" (quoting *Timmons v. Gen. Motors Corp.*, 469 F.3d 1122, 1129 (7th Cir. 2006))); *Bay v. Cassens Transp. Co.*, 212 F.3d 969, 975–76 (7th Cir. 2000) (holding that, absent evidence of bad faith or pretext, an employer is generally entitled to rely on medical determinations of an employee's abilities); *Weiler*, 101 F.3d at 525 (holding that a plaintiff was not a qualified individual where her "own doctor, not [the defendant], has concluded she could not perform her job). And because that assessment would not have allowed Ms. McAllister to return even with modified duties or to another job, those options would not have constituted reasonable accommodations.

Ms. McAllister argues in response that the only reason her doctors prevented her from returning to work was that Innovation was unwilling to offer any accommodations. Thus, she argues, it was Innovation's own refusal to accommodate that left an extended leave as her only option. Ms. McAllister does not cite any evidence that she told her doctors about whether Innovation would offer accommodations or whether that affected their decision to keep her off work, though. Dr. Kachmann testified that Ms. McAllister was not able to work at all at that time, even in a desk job. [DE 72-12 p. 14–17]. Ms. McAllister cites an August 2016 treatment note from an office visit with a physician's assistant, who wrote: "We will keep her off work [for six more weeks] due to lifting restrictions and activities and continue her with physical therapy. I don't feel at this time she is quite ready to go back to work." [DE 72-16]. But as just discussed, her treating physician also wrote that, before returning to work, Ms. McAllister needed to undergo a neuropsychological examination for her concussion symptoms, apart from any physical limitations. He also opined that she was not able to return to work in any capacity at that

9

time. Ms. McAllister has not offered evidence that that had anything to do with whether or not Innovation would have offered accommodations.

Finally, even if there was evidence to the contrary, Ms. McAllister's receipt of disability benefits estops her from arguing that she was able to work. In applying for those benefits, Ms. McAllister and her doctors certified that she was unable to work. Because she succeeded in her claims for those benefits, she cannot now contradict those claims in order to prevail in this case too. *Opsteen v. Keller Structures, Inc.*, 408 F.3d 390, 392 (7th Cir. 2005) ("Litigants who take one view of the facts, and prevail, are equitably estopped to assert the opposite later."). The Supreme Court has held that receiving social security disability benefits does not *always* show that a plaintiff was not a qualified individual under the ADA, as the applicable standards are not identical. *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 802–03 (1999). Given the substantial overlap, though, "an ADA plaintiff cannot simply ignore the apparent contradiction that arises out of the earlier [social security] total disability claim." *Id.* at 806. Instead, the plaintiff must provide an explanation "sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless 'perform the essential functions' of her job, with or without 'reasonable accommodation.'" *Id.* at 807. The Seventh Circuit has applied that standard equally to claims for disability benefits through an employer's benefits plan. *Opsteen*, 408 F.3d at 392.

Ms. McAllister received social security disability benefits and short- and long-term disability benefits on the basis of her and her doctors' representations that she was unable to work. She thus has to explain how she was still able to work so as to be a qualified individual under the ADA. *Cleveland*, 526 U.S. at 806 ("[A] plaintiff's sworn assertion in an application for disability benefits that she is, for example, 'unable to work' will appear to negate an essential

element of her ADA case—at least if she does not offer a sufficient explanation."). The only basis Ms. McAllister offers for reconciling those seemingly contradictory positions is that she didn't apply for disability benefits until after she lost her job. The date she applied isn't material, though. While she applied for those benefits later, the period for which she sought and received benefits included December 2016, and she supported those applications with assertions that she was disabled at that time.

When Ms. McAllister applied for social security disability benefits in September 2017, she represented that she became unable to work on the date of her injury in June 2016, and that she was still disabled. That application was successful and she is still receiving social security disability benefits. She likewise received disability benefits through Innovation's benefits provider, from the time of her accident in June 2016 until October 2018. In support of those benefits, her doctors certified June 2016, in December 2016 (only two days after her employment was terminated), and again in August 2017 that she was unable to work in any capacity. [DE 72-14, 74-6, 74-11]. And to receive those long-term disability benefits, Ms. McAllister had to be unable to perform her job even with accommodations. [*See* DE 82-45 p. 4]. Ms. McAllister received both those forms of benefits for periods that included December 2016, when her employment ended. She cannot now disavow the representations she relied on to receive those benefits in order to recover in this case too.[2] *Opsteen*, 408 F.3d at 392 (holding that "a person who applied for disability benefits must live with the factual representations made to obtain them, and if these show inability to do the job then an ADA claim may be rejected without further inquiry").

---

[2] Ms. McAllister also suggests in passing that her condition fluctuated over time. She doesn't cite evidence in support of that assertion, though. Nor would that explain why her doctor opined only two days after her employment ended that she was unable to work with or without restrictions.

For those reasons, Ms. McAllister cannot show that she was a "qualified individual" at the time Innovation terminated her employment. She was unable to work with or without reasonable accommodations at that time. Her request for another extended period of leave did not qualify as a reasonable accommodation, either. She thus was not protected by the ADA, so the Court grants the motion for summary judgment on that claim.

## IV.  CONCLUSION

The Court GRANTS the motion for summary judgment on all claims. [DE 70]. The Clerk is DIRECTED to enter judgment accordingly. The court GRANTS the motion to seal certain exhibits filed in support of the motion for summary judgment. [DE 73].

SO ORDERED.

ENTERED:  April 13, 2020

/s/ JON E. DEGUILIO<br>
Judge<br>
United States District Court